WILLIAM FOGARTY *et al.*

*v.*

JOSEPH REAM *et al.*

*Filed at Springfield September 30, 1881.*

1. SURETY OF GUARDIAN—*extent of his liability—impeaching guardian's report.* If a guardian makes fictitious reports to the county court, falsely charging himself with money not in fact due from him to his ward, for the fraudulent purpose of making his surety liable, a court of equity will doubtless interfere at the suit of the surety to correct such reports, and make them conform to the truth as to the amount of money in fact owing by the principal.

2. Where, at the death of a guardian, the funds of his ward were in the hands of the attorney of the guardian, who, as the attorney also of the executor of the guardian's estate, had the same inventoried by the executor as coming to his hands, and such attorney, on being appointed as guardian of the ward, procured the allowance of a claim against the estate of the former guardian in favor of the ward for such sum, and afterwards reported to the county court the receipt of the amount of such claim as paid by the executor, when, in fact, no money passed between them, it was *held,* that the surety of the guardian could not have such report set aside as fraudulent, simply because no money, in fact, passed from the executor to the guardian. The charge made against the guardian in such case would not be regarded as fictitious, he being in fact liable in such amount to the ward.

3. Where one being liable for trust funds to an infant is appointed guardian of the infant, and in his report to the county court charges himself with such money as then in his hands, the surety of the guardian will not be permitted to exonerate himself from liability as to such money by showing that the person who had thus become guardian had squandered the same before his appointment.

4. SUBROGATION—*in favor of surety of guardian.* The surety of a guardian who is compelled to pay money to a succeeding guardian of a ward, will in equity be subrogated to all the rights of such succeeding guardian against other persons for the same money.

APPEAL from the Appellate Court for the Third District;— heard in that court on writ of error to the Circuit Court of Logan county; the Hon. CYRUS EPLER, Judge, presiding.

Messrs. BEACH & HODNETT, for the appellants:

1.   The liability of a surety is strictly construed, and can not be extended by implication.   *Stull et al.* v. *Hance*, 62 Ill. 52; *McLain et al.* v. *People, use, etc.* 85 id. 205; *People* v. *Tompkins et al.* 74 id. 482; *Miller* v. *Stewart*, 9 Wheat. 680; *Leggett et al.* v. *Humphrey*, 21 How. 75; *Smith* v. *United States*, 2 Wall. 235; *McIntyre et al.* v. *Trustees of Schools*, 3 Bradw. 77; *Governor* v. *Lagow*, 43 Ill. 134.

2.   A surety is a favorite of the law, and every intendment is in his favor.   *Pope* v. *Chalmers*, 60 N. Y. 164; *Chase* v. *McDonald*, 7 Harris & Johns. 160; *Law* v. *East India Co.* 4 Ves. 824; *Long* v. *Pike*, 27 Ohio St. 498; *Trustees of Schools* v. *Otis et al.* 85 Ill. 179; Brandt on Suretyship and Guaranty, 107, sec. 79.

3.   Sureties on official bonds are only liable for defaults of their principal occurring after the execution of the bond. *McIntyre et al.* v. *Trustees of Schools*, 3 Bradw. 77; *McLain et al.* v. *People, etc.* 85 Ill. 205; *Vivian* v. *Otis*, 24 Wis. 518; *Myles* v. *United States*, 1 McLean, 493; *Farrar et al.* v. *United States*, 5 Pet. 383; *United States* v. *Boyd*, 15 id. 206; *Inhabitants of Rochester* v. *Randall et al.* 105 Mass. 295; *Patterson* v. *Inhabitants of Freehold*, 38 N. J. 255; *Jeffers* v. *Johnson*, 18 N. J. L. 382; *The Mayor* v. *Van Horn.* 2 Harr. 190; *Townsend* v. *Everett*, 4 Ala. 607; *Hitlen* v. *Lane*, 43 Texas, 279; *Mahaska County* v. *Ingalls*, 16 Iowa, 81; *Bessinger* v. *Dickerson*, 20 id. 261; *Warren County* v. *Ward*, 21 id. 84; *School District* v. *McDonald*, 39 id. 564.

4.   A surety on an official bond can always impeach a judgment or settlement of his principal for fraud or collusion. A fraudulent judgment creates no estoppel.   Freeman on Judgments, sec. 250; *Manf'g Co.* v. *Worster*, 45 N. H. 110.

5. A surety on a guardian's bond is not liable for defalcation occurring before the execution of the bond. *Sebastian* v. *Bryan,* 21 Ark. 447.

6. Where one of two innocent parties must suffer from the fraud of a third party, the loss should fall on him who enabled such third party to commit the fraud. *Butlers* v. *Haughwout et al.* 42 Ill. 32; *Michigan Central R. R. Co.* v. *Phillips et al.* 60 id. 190; *Brundage* v. *Camp,* 21 id. 330.

7. The surety could not appeal from the order of the county court, being no party to it, and unless he may file his bill he is without a remedy to correct a false and fraudulent report by which he is robbed of his property.

8. The doctrine announced by the Appellate Court had its origin in *Baker* v. *Preston,* 1 Va. (Gilmer) 235, decided in 1821 by a special court organized to try a single case. That case has been overruled. See *Munford* v. *Overseers,* 2 Randolph, 314; *Chaddock* v. *Turner,* 6 Leigh, 124; *Crawford* v. *Turk,* 24 Gratt. 176.

9. The authorities holding that where a guardian has converted the assets of his ward, or an officer has misappropriated moneys, redress must be had upon his bond in force at the time of the conversion, are numerous. See *State* v. *Rhoades,* 6 Nev. 363; *Notley* v. *Calloway County,* 11 Mo. 457; *State* v. *Norton,* 33 Ark. ——; *Hatch* v. *Attleborough,* 97 Mass. 537; *State* v. *Smith,* 26 Mo. 231; *Freeholders* v. *Wilson,* 1 How. (N. J.) 117; *State* v. *Fullenwider,* 4 Ired. L. 364; *Governor* v. *Sutton,* 4 Dev. & Batt. Law, 484; *Treasurer* v. *Bates,* 2 Bailey, 381.

Messrs. Beason & Blinn, for the appellees:

1. It is not clearly proven that Lynch did not have this fund in his hands after he became guardian.

2. If it be true that Lynch did not have the ward's estate after qualifying as guardian, having filed three reports in the county court that he did have such estate, he is estopped to

deny the truth of those reports. *Townsin* v. *Olin*, 5 Wend. 207; *Eastman* v. *Bennett*, 6 Wis. 232; *Barrett* v. *Copeland*, 18 Vt. 67; *Hoyne* v. *Small*, 22 Me. 14; *Sheldon* v. *Payne*, 3 Seld. 453; *Cave* v. *Harts & Narm*, 913.

3. The sureties on a guardian's bond are estopped by the report of the guardian, the same as the principal. *Pinkstaff* v. *The People*, 59 Ill. 148; *Marly* v. *Town of Metamora*, 78 id. 394; *City of Chicago* v. *Gage*, 95 id. 627; *Commissioners* v. *Mayrant*, 2 Brevard, 228; *Stovall* v. *Banks*, 10 Wall. 583; *The United States* v. *Girault et al.* 11 How. 27.

4. Lynch, after qualifying as guardian, having obtained judgment against French, as executor of Hammon, for $3554.66, in receipting for the money without receiving anything, and satisfying the judgment, broke the condition of his bond.

Mr. JUSTICE SCOTT delivered the opinion of the Court:

The original bill in this case was filed by William Fogarty against Edmond Lynch and others, and the object was to have certain reports, made by defendant Lynch, as guardian of Edward Applegate, to the county court, of funds in his hands belonging to his ward, set aside as fraudulent as to complainant, who was one of the sureties on such guardian's bond, or to have such reports so corrected as to speak the truth as to the amount of funds actually in his hands belonging to his ward. The questions involved have an interest beyond that of the parties concerned, and have been considered with that care their importance demands.

As respects some of the facts there is no disagreement, and these may be shortly stated, with a view to assist to a clearer understanding of the legal questions presented. Prior to April, 1864, Robert Applegate died intestate, leaving him surviving Edward Applegate, his only child and heir at law, then about four years of age. On the 18th day of April, 1864, Jacob Hammon was appointed guardian of the minor

child, and gave bond, in the usual form, in the sum of $2000, with Wesley Montgomery as surety. Hammon continued to act as such guardian until his death, which occurred in November, 1875. It seems the only property that came to the hands of the guardian was real estate that descended to the ward from his ancestor, and the rents and profits accruing therefrom. Under an order of court, the guardian, on the 12th day of February, 1875, sold the real estate of his ward for the sum of $2366.55, the largest portion to John Lockenmyer, and the residue to John Cutlip. The purchasers complied with the terms of sale by paying one-third of the purchase money in cash, and securing the balance with their notes, payable in one and two years, with interest, by mortgage on the premises. At the time Hammon made the sale of his ward's land, defendant Lynch was his attorney, and the cash payments made by the purchasers at the guardian's sale were paid to him by the consent of the guardian, and the money, together with the notes and mortgages taken, remained all the time in the hands of Lynch until the death of the guardian. A small amount of money, derived from a source other than the sale of the ward's land by the guardian, was paid over by him to Lynch, as his attorney.

After the death of Hammon, Ezekiel French was appointed executor of his estate, and after giving the bond required by the court, with Alexander Mills and Daniel French as his sureties, he entered upon the discharge of the duties imposed by his appointment. On the 22d day of December, 1875, defendant Lynch was, by the county court, and perhaps by the selection of the minor himself, appointed guardian of such minor, and required to give bond in the sum of $4000, but he did not give bond until June 11, 1877, when he gave the usual bond, with John Thompson and complainant as his sureties. Failing to give additional security on his bond, as he was required to do by the county court, Lynch was removed, and Joseph Ream was by that court appointed guardian of the

minor.  Other facts are set forth in the bill, some of which are sufficiently established by the evidence, but others are matters of contention between the parties, and only such of them will be referred to as we go on as may be necessary to an understanding of the case.

It is alleged in the bill that Lynch, long before he gave bond with complainant as one of his sureties, had squandered the funds placed in his hands by Hammon, and never afterwards accounted for the same, either to Hammon in his lifetime, or to his executor after his death.  It is conceded Lynch acted as the attorney of the executor of the estate of Hammon, and under his advice the executor inventoried the cash in his hands and the notes given to the guardian as assets of the estate.  After Lynch had given bond and become guardian of his ward, it seems he brought suit as such guardian against French, executor of the estate of Hammon, and recovered a judgment on an allowance of the claim against the estate for $3554.66, which was made up of the amount of cash and notes placed in Lynch's hands by Hammon as funds belonging to his ward, and of the balance due from the estate of the former guardian.  The executor reported to the county court that he had paid the amount of this claim to Lynch, as guardian, and his report in that respect was approved.  Lynch also reported to the county court that he had collected the full amount of the claim against the estate of Hammon, and charged himself with $3138.14 of the same, as having been received in money, and with a note taken from Wesley Montgomery to make up the equivalent of the claim.  His report was approved by the county court.  On the removal of Lynch as guardian he made another report, showing that he had received, in funds belonging to his ward, the sum of $3644.43, which sum he was ordered by the court to pay over to Joseph Ream, his successor in office.

It is charged in the bill, the report of the executor that he had paid to Lynch, as such guardian, the amount of the claim against the estate of Hammon, was untrue; that Lynch's report that he had received payment was also untrue, and that the claim was only satisfied by Lynch's indebtedness to the estate of Hammon, which arose out of his misappropriation of trust funds placed in his hands by Hammon, and which belonged to his ward. It is that report of Lynch, as such guardian, that complainant seeks to impeach as fraudulent as to him, on the ground the funds reported by him as belonging to his ward had, long before Lynch had qualified as guardian, been misappropriated by him, and that nothing had, in fact, been received by him in satisfaction of the claim against the estate of Hammon, the former guardian. To this bill answers were filed by all defendants having any real interest in the litigation, and had the pleadings ended here, only the case now before this court would have been presented for hearing in the circuit court. The case was greatly complicated in that court and in the Appellate Court by cross-bills and answers thereto, and issues formed on the same.

Joseph Ream, the successor to Lynch as guardian of the minor, after filing his answer to the original bill, exhibited his cross-bill, in which he set forth the facts to which we have referred as undisputed facts, and also set forth some new facts, on which he asked relief. It is alleged that before Lynch gave bond so that he could qualify as guardian, he gave up the notes Lockenmyer and Cutlip had given to Hammon for the lands bought at the guardian's sale, and in their stead took from them notes payable to himself for the amount due from them, and that French, as executor of the estate of Hammon, to whom the notes were given, released and caused the mortgage by which they were secured to be entered satisfied, and that afterwards Lynch sold one of the new notes to John A. Lutz, one to Abram Mayfield,

one to William Hargadine, and one to John Houser, and the
note taken from Montgomery was sold to A. B. Roberts, and
it is charged that each of these purchasers had notice these
notes represented trust funds in the hands of Lynch, and
for that reason he had no rightful authority to sell them to
pay his private debts owing to the respective purchasers.
This cross-bill asks a personal decree against Lynch, and his
sureties, John Thompson and complainant, for the whole
amount due the ward, and also a decree against the executor
of the estate of Hammon, for the amount of the claim allowed
in favor of Lynch, as guardian, in which was included the
amount of the notes in Lynch's hands secured by mortgage,
and which the executor released to the makers; and also
for a decree against Lockenmyer and Cutlip for the amount
due on the notes made by them to Hammon for the lands
bought at the guardian's sale; and also for a decree against
the several purchasers of the new notes made by Locken-
myer and Cutlip for the amount of the notes by them sever-
ally bought of Lynch.

Afterwards, Lockenmyer and Cutlip filed a cross-bill as to
matters set forth in the cross-bill of Ream, so far as the
same affected them, alleging therein that the renewal of their
notes which had been given to Hammon was done at the
solicitation of French, the executor, and Lynch, and asks
that the making of the new notes may be regarded as full
payment of their original notes to Hammon, and if that is not
equitable, that a decree may be rendered against French, the
executor, and his sureties, Mills and French, or that a decree
may be rendered severally against Lutz, Mayfield, Hargadine
and Houser for the amount of the notes by them severally
purchased of Lynch, or that a decree be rendered against
Lynch and his sureties for the amount due to the guardian,
to the end that complainants in this cross-bill may be dis-
charged from further payment on account of the lands bought
at the guardian's sale.

Answers were filed to this cross-bill, as well as to the original bill, and the cross-bill of Ream, to which replications were filed. A good deal of testimony was taken. Much of it was as to the solvency of some of the parties alleged to be liable for the trust funds alleged to have been wasted by Lynch, and especially as to the solvency or insolvency of Lynch and the surety on the bond of Hammon, as guardian. On the hearing, the court decreed substantially the relief asked in the original bill and part of the relief asked by Ream in his cross-bill, but no relief was granted to Lockenmyer and Cutlip on their cross-bill. By the decree of the circuit court Lynch was held personally liable for the whole fund that had come to his hands and was then due to his successor, and he was ordered to pay over the same within a time fixed by the court, and in default of payment by Lynch it was further decreed that Montgomery, who was the surety on the bond of Hammon, should pay Ream, the present guardian, $1312.36, and a portion of the costs of suit; that complainant in the original bill, and John Thompson, sureties on the bond of Lynch, as guardian, should pay to Ream $417.76, with interest, and a certain portion of the costs of suit; that Lockenmyer, and George Stoll, who was surety on the note of Lockenmyer, should pay to Ream $2,055.41, with interest, and a certain portion of the costs of suit; that Cutlip should pay to Ream the sum of $139.57, with interest, and a portion of the costs; and that, upon making such payments, the parties paying the same shall be subrogated to the rights of Ream to enforce payment as against Lynch. It was further decreed that the mortgages made by Lockenmyer and Cutlip, that had previously been entered satisfied by French as executor, be revived, and held to be security for the amounts respectively found to be due from them.

The case was taken to the Appellate Court on error, and the cause was heard in that court on errors assigned by Ream on his own behalf, and on errors assigned by Locken-

myer, Cutlip and Stoll, as to matters affecting them person-
ally. The decree of the circuit court was there reversed, and
the cause remanded, with directions to that court to dismiss
the original and all the cross-bills. The case now comes to
this court on the appeal of William Fogarty, the complainant
in the original bill. As complainants in the cross-bills have
assigned no errors in this court, it must be understood they
acquiesce in the decision of the Appellate Court, directing
that their respective cross-bills shall be dismissed. Only a
single question can arise on the record, as the case now
comes before this court, and that is whether complainant is
entitled to the relief sought by his original bill.

The bill in this case is framed on the theory a surety on a
guardian's or other official bond may impeach settlements or
reports made by his principal, although such settlements and
reports may have the approval of a court having jurisdiction to
hear such matters, giving to them a sanction akin to judicial
determination, on account of fraud and collusion practiced
by the principal with others, and that upon the admitted
principle that fraud vitiates everything it touches, whether it
be judicial proceedings or official transactions. Without dis-
cussing cases in which the principle insisted upon might have
its appropriate application, it may well be questioned whether
any such case is presented by this record. The several
reports made by Lynch, as guardian, in which he charges
himself with a certain amount of money as due from him to
his ward, are absolutely true in that respect. The argument
on this branch of the case would have great force if leveled
against purely fictitious reports, in which the principal falsely
charges himself with sums of money not in fact due from
him, for the fraudulent purpose of making the surety liable.
Had this bill presented such a case, doubtless it would be
conceded equity would interpose to make such reports con-
form to the truth as to the amount of money in fact owing
by the principal. But no such question is involved. In this

case it is not claimed, nor could it be done with any show of sustaining such charge, that the guardian, in any report made by him to the county court, charged himself with more money than was actually due to his ward. In that respect he neither concealed nor enlarged anything. The only particular in which it is assumed the guardian's reports are untrue is, that he claimed to have certain sums of money on hand belonging to his ward, when in truth and in fact he did not have the money or securities for the same on hand at the date of his several reports. Considering the reports of the guardian in the inverse order in which they were made, it will be noted his last report, made at the April term of court, 1878, is not open to this objection. The guardian simply charges himself with certain amounts, without saying whether he has on hand the money or securities equivalent to the same. Of the second report the same thing may be said. In that report he charges himself with the balance on hand at date of last report, and the accruing interest, and as to whether he then had on hand the money or the securities for the sum due his ward, the report is silent. It can not be maintained that either of these reports is untrue or fictitious in any particular. As respects one item, and it is the principal one in the first report the guardian made to the county court, it may be conceded it is not correct or true as therein stated, if it is to be read literally. He there charges himself with "cash on hand received this day from Ezekiel French, executor of the last will and testament of Jacob Hammon, deceased, $3138.14." No money was in fact received that day from the executor by the guardian. That item was in part payment of the claim allowed against the estate of Hammon, and in favor of Lynch. The balance of that claim, as the reports show, was paid by the note of Montgomery, the security on Hammon's bond, and which was made payable directly to Lynch, and as to which complainant makes no question but what he is liable as the

surety of Lynch. The explanation of this item contained in
the first report of the guardian is this: It represents the
trust funds placed in the hands of Lynch by Hammon, and
which belonged to his ward. Hammon treated the money
and notes in the hands of Lynch, who was his attorney and
adviser, as being in his own possession. After the death of
Hammon his executor seems to have done the same thing.
He charged himself, both in the inventory filed and in his
report made to the court for the settlement of his accounts
as executor, with the funds in the hands of Lynch, who was
also his attorney, precisely the same as he would have done
had such funds been in his own actual possession at the time.
When the guardian and the executor came to settle the claim
of the guardian against the estate of Hammon, they treated
the money as still being in the hands of Lynch, and the
guardian receipted the claim as having been paid by the
executor,—no money in fact passing between them. As
between the guardian and the executor the transaction was
no doubt valid, but whether it would operate to exonerate
the executor and his sureties from actual payment in money
is a question not now before us, and for that reason no opin-
ion will be expressed touching it.

Had it appeared Lynch still had the trust funds on hand,
or other funds with which to replace the same, when com-
plainant became his surety on his official bond, his liability
for any waste of such funds thereafter would not be con-
tested. It is sought, however, to prove the guardian did not
have in his possession or control the trust funds at the time
complainant became his surety, but had previously wasted
the same, and was then, and has ever since continued to be,
insolvent. This the policy of the law will not permit him
to do. It would open a wide door for frauds in such matters.
Here the guardian elects to charge himself with the full
amount of a claim in his favor for funds belonging to his
ward. It is neither a false nor a fictitious claim. The money

is absolutely due from the guardian to his ward, and neither the guardian nor his surety will be permitted to deny he has the money admitted to be in his hands. Any other rule would be a most unsafe one, and would lead to results the law will not tolerate. No case exactly analogous with the one at bar has before arisen in this State, but the same principle has been applied to sureties of defaulting municipal officers. *Morley* v. *Town of Metamora,* 78 Ill. 394; *City of Chicago* v. *Gage,* 95 id. 625; *Cawley* v. *The People,* 95 id. 249. A case more like the one at bar is *Roper* v. *Sangamon Lodge,* 91 Ill. 518. No reason is perceived why the rule applied in the cases cited may not, with equal propriety, be applied to sureties of guardians, and other such officers.

Without admitting the rule stated would be a harsh one, and perhaps in some cases would work great hardship, it may be noted it would, in this case, work no surprise to complainant, as he was told by Lynch himself, before he became surety on his bond, the amount the ward would be entitled to would exceed $3000. No fraud was practiced on him in that respect. The amount of the risk he was about to assume was fully made known to him, and with a knowledge of these facts he voluntarily became obligated by a condition in his bond, as surety, that Lynch would pay to the party entitled thereto "all estate, title papers and effects remaining in his hands, or due from him." Whether Lynch was solvent or insolvent, was a question as open to him then for investigation as now, and equity will not interpose to relieve him from obligations voluntarily assumed, without the imposition of any fraudulent practices on the part of any one.

There is another consideration that leads to the same conclusion. If complainant can be permitted to show the trust funds were misapplied by Lynch prior to his becoming his surety on his official bond, so as to exonerate him from liability on such bond, that defence could better be made in the action at law on the official bond of the guardian, which is

now pending and undetermined in a common law court, and there is therefore no reason why a court of equity would assume jurisdiction in the premises.

It may not be improper to add, that in the event complainant shall be compelled to pay the amount due from Lynch to his ward, to his successor, Ream, he will be entitled to be subrogated to whatever rights Ream has or might have to enforce payment from Lynch, or from the executor of the estate of Hammon and his sureties on the claim allowed against the estate, or as against Lockenmyer or Cutlip, or as against any of the purchasers of the notes given by Lockenmyer or Cutlip to Lynch, or either or all of them. The present bill was not framed with reference to obtaining such relief, and if it had been it would have been premature, as complainant had paid nothing as the surety of Lynch when the original bill was filed. As to what rights or remedies Ream has or might have against any or either of the parties named, we do not wish to be understood as now expressing any opinion.

The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*